# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:15-cr-104 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| FESUM OGBAZION (1), | : | |
| | : | |
| Defendant. | : | |

**ORDER:**
**(1) GRANTING IN PART DEFENDANT'S RULE 29 MOTION;**
**(2) CONDITIONALLY DENYING A NEW TRIAL AS TO COUNTS 3-7;**
**AND (3) DENYING DEFENDANT'S RULE 33 MOTION**

This criminal case is before the Court on Defendant's motion for judgment of acquittal and motion for a new trial (Doc. 181), as well as the parties' responsive memoranda (Docs. 182, 185). The Court subsequently heard oral argument on Defendant's motion. (Doc. 191).

On June 18, 2020, the Court issued a Notation Order on the docket, advising the parties of the Court's ruling, pending the issuance of this Order. Specifically, the Court's Notation Order stated, in relevant part, as follows:

> This case is before the Court on Defendant's Rule 29 and Rule 33 motion. (Doc. 181). Although a thorough written order from the Court is forthcoming, the Court issues this notation order to memorialize its ruling in sum. Specifically, Defendant's motion for judgment of acquittal as to Counts 3-7 is GRANTED; Defendant's motion is DENIED in all other respects. … IT IS SO ORDERED.

(Not. Order, Jun. 18, 2020). The Court now issues this Order, detailing the basis for its decision.

# I. BACKGROUND

Defendant Fesum Ogbazion ("Defendant" or "Defendant Ogbazion") formerly owned and operated ITS Financial, LLC ("ITS Financial"). (Doc. 82 at ¶ 3). ITS Financial was headquartered in Dayton, Ohio, and was the national franchisor of Instant Tax Service ("ITS"), a nationwide tax preparation franchise business started by Defendant in 2004 and marketed by ITS Financial throughout the United States. (*Id*.) During its operation, ITS was purported to be the fourth largest tax preparation company in the United States.

Defendant Ogbazion was also the founder and sole-owner of TCA Financial, LLC ("TCA"), which served as the holding company for ITS Financial. (*Id*. at ¶ 4). Defendant Ogbazion was also the founder and sole-owner of Tax Tree, LLC ("Tax Tree"), an entity formed as a means of self-funding ITS loan products, including Instant Cash Loans ("ICL") and Refund Anticipation Loans ("RAL"), which were marketed nationwide to ITS customers. (*Id*. at ¶¶ 5, 21; Doc. 45 at 6).[1]

ITS ceased operation in 2012 and was permanently enjoined from further operation in 2013, as a result of a civil enforcement action, brought by the Department of Justice Tax Division, against Defendant Ogbazion, ITS Financial, TCA, and Tax Tree. *United States v. Fesum Ogbazion, et al.*, No. 3:12-cv-0095 (S.D. Ohio, Mar. 28, 2012).

---

[1] ICLs and RALs are "loans to taxpayers based on taxpayers' expected income tax refunds." (Doc. 82 at ¶ 21). An ICL is offered to taxpayers *before* the tax filing season, based on a preliminary or estimated tax return. (*Id*. at ¶ 22). An RAL is applied for *after* the start of the tax filing season and is based on the taxpayers' actual income tax return. (*Id*. at ¶ 26).

Nearly two years later, the Government commenced the instant criminal case against Defendant Ogbazion and co-Defendant Kyle Wade. (Doc. 6).[2]

Specifically, on August 25, 2015, Defendants Fesum Ogbazion and Kyle Wade, were charged by way of a 23-count Indictment with: engaging in a corrupt endeavor to obstruct and impede the due administration of the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a) (Count 1); conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 2); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 3-7); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(ii) (Counts 8-13); bank fraud, in violation of 18 U.S.C. § 1344 (Count 14); tax evasion, in violation of 26 U.S.C. § 7201 (Count 15); and failure to collect and pay over payroll tax, in violation of 26 U.S.C. § 7202 (Counts 16-23). (Doc. 6).[3] On February 9, 2016, Defendant filed a motion to dismiss the Indictment (Doc. 45), which motion this Court granted in part. (Doc. 66). Specifically, the Court dismissed Count 1 of the Indictment, but denied Defendant's motion in all other respects. (*Id*.)

On January 24, 2017, the Government filed a 31-count Superseding Indictment against Defendants Ogbazion and Wade, charging: conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count 2); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 3-7); money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(ii) (Counts 8-

---

[2] Co-Defendant Kyle Wade served as the Vice President of Franchising for ITS and also owned and operated ITS franchises in the Dayton area. (Doc. 82 at ¶ 7). Co-Defendant Wade ultimately pled guilty and did not participate in the trial. *See, infra,* at 4.

[3] Defendant Ogbazion was charged in all counts of the Indictment, while co-Defendant Wade was charged in Counts 1 through 7 only. (Doc. 6).

13); bank fraud, in violation of 18 U.S.C. § 1344 (Count 14); tax evasion, in violation of 26 U.S.C. § 7201 (Count 15); failure to collect and pay over payroll tax, in violation of 26 U.S.C. § 7202 (Counts 16-23); conspiracy to defraud the United States and to commit wire fraud, in violation of 18 U.S.C. § 371 (Count 24); and wire fraud, in violation of 18 U.S.C. § 1343 (Counts 25-32).  (Doc. 82).[4]  Defendant Ogbazion was named in all counts of the Superseding Indictment, while co-Defendant Wade was named in Counts 2-7 and 24-32.  (*Id*.)

On March 29, 2017, co-Defendant Wade entered a plea of guilty to a one-count Information, which charged obstructing and impeding the due administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a).  (Min. Entry, Mar. 27, 2017).

Defendant Ogbazion proceeded to jury trial, commencing on May 15, 2017.  (Min. Entry, May 16, 2017).  Upon conclusion of the Government's case-in-chief and at the close of all evidence, Defendant orally moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a), which this Court denied.  (Doc. 162; Not. Order, May 30, 2017).  Jury deliberations began on June 1, 2017 and concluded on June 2, 2017.  (Min. Entry, June 1, 2017 & June 2, 2017).  The jury returned a verdict on all charges, finding Defendant guilty as to Count 2 (conspiracy to commit wire fraud), Counts 3 through 7 (wire fraud),

---

[4] The Superseding Indictment commences with Count 2 and ends with Count 32 (Doc. 82), reflecting this Court's prior dismissal of Count 1 of the initial Indictment (Doc. 66).  The Superseding Indictment also contains a number of scrivener's errors—*i.e.*, the payroll tax amounts alleged in Counts 16-23 (Doc. 82 at 23) and reference to 34 counts (*id*. at 33)—which errors this Court permitted the Government to correct, three days after the filing of the Superseding Indictment, without objection from the defense.  (Doc. 128; Min. Entry & Not. Order, Jan. 27, 2017).

Count 14 (bank fraud), Count 15 (tax evasion), and Counts 16 through 23 (failure to collect and pay over payroll tax).  Defendant was acquitted as to Counts 8 through 13 (money laundering), Count 24 (conspiracy to defraud the United States and to commit wire fraud), and Counts 25 through 32 (wire fraud).[5]  (Doc. 173).

After the jury's verdict, Defendant filed the instant motion for judgment of acquittal or, in the alternative, a new trial, pursuant to Fed. R. Crim. P. 29(c) and 33. (Doc. 181).

## II.  STANDARD OF REVIEW

### A.  Motion for Judgment of Acquittal

Upon a defendant's Rule 29 motion made or renewed after the jury has returned a guilty verdict, the Court may set aside the verdict and enter an acquittal as to any offense for which the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a), (c).

The test for determining sufficiency of the evidence is "whether, 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could [find] the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

---

[5] Although the jury technically found Defendant guilty on Count 24, the jury further determined that the charge was not brought within the statute of limitations period.  (Doc. 173 at 7-8). Accordingly, the guilty verdict must be set aside and, following sentencing, a judgment of acquittal will be entered as to Count 24, as well as all other counts on which Defendant was acquitted.  In that regard, the Government's motion for an entry of acquittal as to Count 24 is GRANTED.  (Doc. 183).

"In addressing a Rule 29 motion, the Court may not make credibility determinations, and may not weigh the evidence." *United States v. Gen. Elec. Co.*, 869 F. Supp. 1285, 1290 (S.D. Ohio 1994) (citing *United States v. Davis*, 981 F.2d 906, 908 (6th Cir. 1992)).  Also, "the Court must resolve any conflicts in the testimony in favor of the prosecution." *Id.* (citing *United States v. Tilton*, 714 F.2d 642, 645 (6th Cir. 1983)).

### B.  Motion for a New Trial

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  However, "[a] trial court should only grant [a new trial] when the verdict is against the 'manifest weight' of the evidence." *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019) (quoting *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018)).  Indeed, Rule 33 motions "are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *United States v. Hughes*, 505 F.3d 578, 592-93 (6th Cir. 2007) (emphasis added).

"When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998) (citing *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)).  Granting a motion for a new trial "based on the verdict being against the manifest weight of the evidence is proper when the government has presented sufficient evidence to convict, but the judge disagrees with the

6

jury's resolution of conflicting evidence." *Id.* (citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)).

## III. ANALYSIS

Defendant moves for judgment of acquittal as to each count of conviction—Count 2 (conspiracy to commit wire fraud), Counts 3 through 7 (wire fraud), Count 14 (bank fraud), Count 15 (tax evasion), and Counts 16 through 23 (failure to collect and pay over payroll tax)—arguing that the Government failed to present sufficient evidence to support the convictions. (Doc. 181). In the alternative, Defendant moves for a new trial on all of these counts, arguing that the trial was tainted by the admission of hearsay testimony and improper jury instructions. (*Id.*)

The Court will address Defendant's arguments for judgment of acquittal as to each count of conviction and then address Defendant's alternative remedy of a new trial.

### A. Judgment of Acquittal

#### 1. Count 2 – Conspiracy to Commit Wire Fraud [6]

Count 2 of the Superseding Indictment charges Defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. (Doc. 82 at 1-11).

"To establish conspiracy to commit wire fraud under 18 U.S.C. § 1349, the government must demonstrate that 'two or more persons conspired, or agreed, to commit

---

[6] The Government alleged that Count 2 (the conspiracy) and Counts 3 to 7 (the wire fraud) all arise from the same scheme to defraud. (Doc. 82 at 1-12). The Court will explain the scheme, including the scheme's general purpose and execution, in its analysis of Count 2. The Court will then provide further details of the scheme—specifically, those details relevant to the wire fraud charges—in its analysis of Counts 3 to 7, *infra*.

the crime of [wire fraud] and that the defendant knowingly and voluntarily joined the conspiracy.'" *United States v. Harrison*, 663 F. App'x 460, 464 (6th Cir. 2016) (quoting *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014)). Unlike a conspiracy charged under 18 U.S.C. § 371, a conspiracy under 18 U.S.C. § 1349 does not require proof of an overt act. *Rogers*, 769 F.3d at 380-82.

"To show an agreement, the government need only prove that the co-conspirators 'in some way or manner … came to a mutual understanding to try to accomplish a common and unlawful plan.'" *Whitfield*, 663 F. App'x at 408 (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). "A finding of conspiracy does not require proof of formal agreement; a mere tacit understanding among the participants is sufficient." *Harrison*, 663 F. App'x at 464 (citing *United States v. Hamilton*, 263 F.3d 645, 652 (6th Cir. 2001)).

"Once a conspiracy has been established, the prosecution need only produce slight evidence to implicate the defendant." *Fisher*, 648 F.3d at 450–51 (quoting *United States v. Sturman*, 951 F.2d 1466, 1474 (6th Cir. 1991)). Moreover, "[t]he existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id*. (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)). Indeed, "[c]ircumstantial evidence and direct evidence are accorded the same weight, and the uncorroborated testimony of an accomplice may support a conviction." *Whitfield*, 663 F. App'x at 408 (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)).

Here, the Government alleged in Count 2 that Defendants Ogbazion and Wade, along with other individuals, conspired to commit the offense of wire fraud, commencing in or around December 2009 and continuing until November 1, 2012.  (Doc. 82 at ¶ 28). The object of the conspiracy is described in the Superseding Indictment as follows:

> It was the object of this conspiracy for [Defendants Ogbazion and Wade] to generate loan fees for ITS and its franchises by luring customers into ITS franchises through false and fraudulent means, to wit: advertising that ITS could offer customers loans in advance of their expected federal income tax refunds, knowing full well that in 2010 and 2011 ITS did not have a relationship with an independent lender that could provide funding for the loans advertised.

(*Id*. at ¶ 29).

In other words, the Government alleged that, during the 2010 and 2011 tax filing seasons, at the direction of Defendants Ogbazion and Wade, ITS used false and deceptive advertising to market ITS loan products, including ICLs and RALs, despite knowing that ITS lacked funding from an independent, third-party lender to provide any such services, all in an effort to lure customers to ITS.[7]  (*Id*. at ¶¶ 29, 33, 37).[8]

As to the 2010 tax filing season, the Government presented testimony and other evidence that, by December 30, 2009, Defendant was aware ITS did not have a lender to fund the ICL and RAL programs.

---

[7] The "2010 tax filing season" refers to the period starting in early-January 2010, when individuals began filing their tax returns for the 2009 tax year.  The "2011 tax filing season" refers  to the period starting in early-January 2011, when individuals began filing their tax returns for the 2010 tax year.

[8] The Court's summary, *infra*, is merely a brief overview of the ample testimony and evidence the Government presented in support of Count 2.

Specifically, the Government offered the testimony of John Thompson, the co-founder of a company called Advent. (Doc. 203 at 74-95). Mr. Thompson testified that in the summer/fall of 2009, he was part of a team negotiating directly with Defendant, in an effort to reach an agreement wherein Advent would offer services to ITS, including: "[t]ax software to prepare and file tax returns; refund transfers of settlement products for consumers to receive the refund and pay for their tax prep; prepaid debit cards; prepaid debit cards that had ITS' name on it; refund anticipation loans; and a product as well that was called the ICL …." (*Id*. at 76-77). Mr. Thompson further testified that Advent and ITS initially reached an agreement, and Advent began offering services to ITS on December 26, 2009. (*Id*. at 78). However, due to a series of disputes between Advent and ITS, which disputes Defendant was aware of and/or directly involved in, the agreement between Advent and ITS terminated by December 30, 2009. (*Id*. at 78, 80-91). Specifically, on December 30, 2009, the President of Advent, Bernie Wilson, wrote a letter addressed to Defendant, which letter set forth a number of grievances and ultimately concluded with: "As a result of the foregoing, Advent hereby provides notice of termination of the Agreement…." (Gov. Ex. 124.4). Accordingly, after December 30, 2009, Defendant was aware that ITS did not have a lender to secure funds for RALs.

Brook Wise, who served as ITS's vice president of franchise recruitment from September 2007 to March 2010, testified that Defendant owned and operated ITS and Tax Tree, that Defendant was involved in all major decisions made at ITS, and that all ITS corporate employees reported to Defendant. (Doc. 202 at 6-7, 10-11, 18-21, 24-27). Mr. Wise further testified that operational decisions, such as advertising, marketing loan

products, and establishing fees, were controlled at the ITS corporate level and not by the ITS franchisees.  (*Id*. at 23-24).

Additionally, Mr. Wise testified that ITS offered the lending products "to help drive customers to the franchisee locations."  (*Id*. at 23).  He further testified that in December 2009 to January 2010, ITS was advertising lending products—specifically, ICLs and RALs—despite not having a lender.  (*Id*. at 46-51).

Mr. Wise also testified that co-Defendant Kyle Wade, who served as ITS's vice president of franchising, oversaw all franchise operations and was in charge of training franchisees, as well as maintaining frequent communications with the franchisees.  (*Id*. at 20-21).  Specifically, co-Defendant Wade prepared and sent out regular, informational emails to all franchisees and also held telephone conferences open to all franchisees, occurring once per week before tax season began and twice per week when tax season was underway.  (*Id*. at 20-21, 28-29).  Mr. Wise testified that Defendant Ogbazion would also participate during the franchisee calls on occasion.  (*Id*. at 21).

Mr. Wise testified that the ITS corporate leadership team—which included Defendants Ogbazion and Wade, as well as Mr. Wise, Peter Samborsky, ITS President James Mowery, ITS vice president of marketing Greg Woryk, and others—held  weekly meetings leading up to and during tax season.  (*Id*. at 27).  And while Defendant did not attend all of the leadership team meetings, the minutes from all meetings were circulated among the leadership team, including to Defendant.  (*Id*. at 27-28).

The Government presented, as evidence, the minutes from a leadership team meeting held on January 13, 2010 (*i.e.*, during the 2010 tax filing season).  (Gov. Ex.

60.3).  Mr. Wise was present during that particular meeting and confirmed, as the meeting minutes reflect, that the topic of issue at the meeting was the fact that ITS franchisees were inquiring as to the availability of loan products that ITS corporate was actively advertising—specifically RALs, which were particularly effective at bringing in customers who wanted an advance on their tax refunds.  (Doc. 202 at 29-34, 46).  During the meeting, the leadership team discussed the fact that, unbeknownst to the franchisees, ITS had no lender to fund the loan products being marketed.  (*Id*. at 29-34).  However, the leadership team, at the behest of co-Defendant Kyle Wade—ultimately elected not inform the franchisees that ITS had no funding for the RALs.[9]  (*Id*. at 29-34, 53, 185).

Mr. Wise further explained that customers were coming into ITS franchises in December 2009 and applying for ICLs, only to be denied.  (*Id*. at 50-54).  Mr. Wise explained that customers were denied because ITS actually had no loan products to offer. (*Id*.)  However, ITS customers were told that the loan products had sold out due to their high demand.  (*Id*.)

---

[9] In support of his argument for a new trial, Defendant argues that the trial was tainted by the admission of co-Defendant Wade's out of court statements.  While the Court addresses this argument more fully in Section 3B, *infra*, the Court notes that the admission of co-Defendant Wade's statements through the testimony of various witnesses did not constitute hearsay for a number of reasons, separate and apart from being the statement of a co-conspirator made during and in furtherance of the conspiracy.  For instance, as testified to by Mr. Wise, the statements of co-Defendant Wade, in this context, were not offered for the truth of the matter asserted, but rather to explain why the leadership team elected not to advise franchisees of the true status of the RALs.  Accordingly, the statements of co-Defendant Wade, as testified to by Mr. Wise, and as officially memorialized in the weekly meeting minutes, are not hearsay, pursuant to Fed. R. Evid. 801(c)(2) and 801(d)(2)(E), and, in any event, meet the exception for records of a regularly conducted activity, pursuant to Fed. R. Evid. 803(6).

The Government also presented the testimony of Lance Dohm, who was an ITS franchise manager in 2010. (*Id*. at 192). Mr. Dohm testified regarding what he called the "RAL denial program." (*Id*. at 218). Mr. Dohm explained that franchisees had not been advised that ITS had no lender for advertised loan products until late in the 2010 tax filing season. (*Id*. at 216-17). And therefore customers were applying for loan products but being denied every time. (*Id*. at 218, 228). Additionally, customers were charged a bank fee for the application. (*Id*. at 228-29).

As to the 2011 tax filing season, the Government presented testimony and other evidence that Defendant formed Tax Tree to serve as the RAL lender, and Defendant was therefore aware that the lender was not an independent third-party.

Specifically, the Government offered the testimony of Peter Samborsky, who was the CFO and VP of Finance for ITS during the relevant time period. (Doc. 203 at 135-174; Doc. 196 at 10-92). Mr. Samborsky testified that Tax Tree was formed "to be the bank to issue RALs and the bank to receive the tax refunds and process those." (Doc. 203 at 145-46).[10] Mr. Samborsky further testified that Tax Tree had no independent employees of its own and that Tax Tree operated entirely out the ITS corporate headquarters in Dayton, Ohio. (*Id*.)

Additionally, the Government offered the testimony of Tara Sparks, who served as a tax preparer at Defendant Wade's Middletown, Ohio ITS franchise and later served as

---

[10] The Articles of Organization for Tax Tree were admitted into evidence as Gov. Ex. 1.24. (Doc. 202 at 10). The exhibit evidences that Tax Tree was registered in South Dakota in December 2010, and later registered in the state of Ohio. (Gov. Ex. 1.24). Tax Tree's Ohio registration bears Defendant Ogbazion's signature. (*Id*.)

the office manager at the same location. (*Id*. at 244-45). Ms. Sparks testified that she had participated in telephone conversations with Defendants Wade and Ogbazion, during which Defendants stated that they were <u>not</u> going to advise ITS customers that Defendant Ogbazion also owned Tax Tree. (*Id*. at 264-65). Ms. Sparks explained that a number of issues arose with Tax Tree serving as the lender during the 2011 tax filing season. (*Id*. at 265). Specifically, Ms. Sparks stated that Tax Tree ran out of funds for the loan products. (*Id*.) Additionally, she testified that ITS corporate had provided a list of individuals who were pre-approved for loan products, and that all other customers were to be denied. (*Id*.) And despite knowing in advance that the customers would be denied, the customers were still encouraged to apply for the loans and were charged a fee ranging from $150 to $300 per application, according to Ms. Sparks. (*Id*. at 266).

Finally, the Government presented evidence of the advertisements run immediately prior to and during the 2011 tax filing season, showing that ITS was marketing the loan products as being funded by an independent third-party lender. (Gov. Ex. 125.1; Doc. 188 at 67-68).[11] The Government offered the testimony of David Bittner, who produced ITS's television and radio advertisements for Defendant. (Doc.

---

[11] Government's Exhibit 125.1 contains all of the advertisements from the 2010 and 2011 tax filing seasons. Defendant takes issue with the 2010 tax filing season advertisements, arguing that the metadata indicates the advertisements were only created in December 2010 (*i.e.*, nearly a year after the Government said the advertisements were run). However, the Court notes that the date Defendant refers to is <u>not</u> the date that the advertisements were *created*, but the date they were last *modified*. Thus, the date does not support Defendant's argument. Also, even absent the actual advertisements, the Government presented ample testimony from individuals who confirmed that advertising was run during the 2010 tax filing season. And the advertisements in Gov. Ex. 125.1 support the proposition that Tax Tree was being marketed as an independent, third-party lender during the 2011 tax filing season.

188 at 60). Mr. Bittner testified that he worked closely with Defendant in producing the advertisements that ITS ran for the 2010 and 2011 tax filing seasons, and that Defendant approved the scripts, contents, and final product. (*Id*. at 62). Additionally, Mr. Bittner testified that Defendant and others at ITS corporate provided him with disclaimers to include in the advertisements for the 2011 tax filing season, which disclaimers state that the loan products being advertised are offered by independent, third-party lenders. (*Id*. at 66-68, 77; Gov. Ex. 125.10).

In short, the Government presented ample evidence showing that, prior to and during the 2010 tax filing season, Defendant and other ITS corporate officers knowingly continued to run nationwide radio and television advertisements (*i.e.*, wire communications), stating that ITS was offering loan products to customers, despite the fact that, as of December 30, 2009, Defendant was aware that ITS had no relationship with a lender. Additionally, during this time, ITS corporate did not immediately advise franchisees that ITS had no relationship with a lender, and thus both franchisees and customers were misled into believing that ITS had a means to offer the loan products being advertised. The Government's evidence also shows that the motivation for continuing these advertisements was that the loan products were drawing in customers to ITS franchises. And once in the ITS stores, customers were allowed to apply and were charged a fee to apply for loan products, despite the fact that no loan products were available and the customers' applications were uniformly denied.

As to the 2011 tax filing season, the Government presented ample evidence showing that ITS was funding loan products through Defendant's own company, Tax

Tree. And due to the problematic nature of Tax Tree's relationship with ITS, Defendant Ogbazion and co-Defendant Wade deliberately elected not to disclose the nature of that relationship—*i.e.*, that Defendant Ogbazion owned both ITS and Tax Tree. Moreover, ITS advertised loan products prior to and during the 2011 tax filing season, which advertisements included a disclaimer stating that Tax Tree was an independent, third-party lender. And Defendant specifically reviewed and approved these advertisements, despite knowing that the disclaimer was false.

As summarized above, the Court finds that the Government presented more than sufficient evidence for the jury to find both the existence of the conspiracy as charged, as well as Defendant Ogbazion's knowing participation in said conspiracy. Accordingly, Defendant's motion for judgment of acquittal as to Count 2 is denied.

### 2. *Counts 3 to 7 – Wire Fraud*

Counts 3 through 7 of the Superseding Indictment charge Defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343. (Doc. 82 at 11-12).[12]

The offense of wire fraud, under 18 U.S.C. § 1343, requires proof of three elements: (1) "the defendant devised or willfully participated in a scheme to defraud"; (2) the defendant "used or caused to be used an interstate wire communication 'in furtherance of the scheme'"; and (3) the defendant "intended 'to deprive a victim of

---

[12] Because the wire fraud and mail fraud statutes have nearly identical elements, the same legal analysis is applicable to both, and case law as to one statute is generally applicable to the other. *See Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987); *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (citing *United States v. Bibby*, 752 F.2d 1116, 1126 (6th Cir. 1985)).

money or property.'" *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (quoting *United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000)).

A defendant has used or caused the use of wires if "it is foreseeable that the … wire services could be used to further his scheme." *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994) (citing *United States v. Campbell*, 845 F.2d 1374, 1382 (6th Cir. 1988)). "The [wire transmission] will be in furtherance of the scheme to defraud if it meets the foreseeability requirement and is 'closely related to the scheme.'" *Id*. (citing *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988). In order to show that a wire communication was 'closely related to the scheme' to defraud, "the scheme's completion or the prevention of its detection **must have depended** in some way on the **charged** [wire transmissions]." *United States v. Daniel*, 329 F.3d 480, 489 (6th Cir. 2003) (quoting *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986)) (emphasis added).

Here, the Government alleges that the scheme to defraud in Count 2 is the underlying scheme of the wire fraud offenses charged in Counts 3 through 7. (Doc. 82 at 12, ¶ 49). In short, as to Counts 3 through 7, the crux of the Government's allegations is that Defendant devised or willfully participated in a scheme: to deprive ITS customers of money by running radio and television advertisements, promising customers 'fast cash' through independently-funded loan products that Defendant knew ITS could not provide, all in an effort to lure customers into ITS, where franchisees would proceed to charge the customers for services, such as applying for loans (that the customers were never going to get) or filing tax returns (even if the customers did not authorize ITS to do so). (*Id*. at ¶¶ 29, 31, 34-42, 46). On their own, these allegations meet all of the elements of wire

fraud. And had the Government used those allegations to charge just one single, substantive wire fraud count, the jury in all likelihood would have returned a guilty verdict—given that it did so with the conspiracy charged in Count 2.

The problem, however, is that the Government did not charge one substantive count of wire fraud based on just those allegations. Rather, the Government charged five separate counts of wire fraud, each of which relates to a wire transfer executed by a company called Insight Card Services ("Insight"). Insight was a legitimate business without culpability for Defendant Ogbazion's scheme to defraud taxpayers. Nevertheless, for purposes of this analysis, the Court must explain the arrangement between ITS and Insight.

Insight was an issuer of prepaid Visa cards. (Doc. 203 at 97). In 2011, ITS became a customer of Insight. (*Id*.) Specifically, Insight provided ITS with refund processing services and issued tax refunds to ITS customers on prepaid cards. (*Id*.) At trial, the Government offered the testimony of Insight's founder, Bill Smith. (*Id*. at 96). As to refund processing services, Mr. Smith testified that: "the best way to describe it, when people file tax returns, in a lot of cases they want to have a third party process the returns so they can take care of the payment of their preparation fees and the disbursements of their refund." (*Id*. at 97) (emphasis added). Mr. Smith explained that after ITS filed tax returns on behalf of its customers, the IRS would send the customers' tax refunds to Insight, then Insight—after a series of internal transfers through Insight's various bank accounts—would in turn deduct ITS's fees (including tax preparation fees and bank fees), and Insight would then wire transfer the fees to ITS and place the

18

remainder of the tax refunds on prepaid cards that were issued to ITS's customers. (*Id.* at 97-98). Mr. Smith further testified that Insight was able to deduct the correct amount of the ITS fees because, after filing a tax return, ITS would advise Insight of the fees ITS charged each particular customer. (*Id.* at 98). Mr. Smith stated that Insight "would take … all the preparation fees that we would deduct for one particular company, for example, and we would transfer them to that company's account." (*Id.* at 99). Finally, Mr. Smith testified that Defendant provided Insight all instructions on behalf of ITS, "as to the disbursement of the fees and the tax refunds…." (*Id.* at 100).

The Government also offered the testimony of Diane Piccolo, who was an employee of Insight in 2011. (*Id.* at 103). Ms. Piccolo explained the structure of how funds were transferred from the IRS to Insight and finally to ITS and its customers. (*Id.* at 103-11). The chart below illustrates Ms. Piccolo's testimony:



As reflected in the chart, the ITS customer tax refunds went from the IRS to Insight's bank account at Urban Trust Bank ("UTB").  From there, Insight would transfer all of the tax refunds into a separate pre-funding account at UTB, which account also belonged to Insight.  Ms. Piccolo explained that the pre-funding account was "an account that Insight needed to hold at the bank in order for [Insight] to be able to deliver ACH transactions earlier than when their actual effective date was so that cardholders could use their money as soon as we received it."  (*Id*. at 107).  From the pre-funding account, Insight would transfer the tax refunds again into another Insight account, this time at National Bank of Commerce ("NBC").  And only then, out of the NBC bank account, did Insight separate out the tax preparers' fees from the customers' refunds.  The fees were wired to the tax preparer out of the NBC bank account, and the remainder of the customers' refunds were issued onto the pre-paid cards and provided to the customers.

As previously stated, the Government could have relied on any number of wire transmissions that took place within the scope of the alleged scheme to defraud, and thus charged one, all-encompassing count of wire fraud.  But the Government instead chose to charge Defendant with five individual counts of wire fraud, based on five individual wire transfers.  Specifically, the Government hinged each substantive count of wire fraud on a separate wire transfer of money from **Insight's** pre-funding bank account at UTB, into **Insight's** bank account at NBC—specifically, $1,262,197 on January 26, 2011 (Count 3); $1,906,199 on January 28, 2011 (Count 4); $17,740,900 on January 31, 2011 (Count 5); $4,000,000 on February 7, 2011 (Count 6); and $898,615 on February 11, 2011 (Count 7).  (Doc. 82 at 12).  And the Government alleges that Defendant **caused** these five wire

transmissions "in furtherance of, and for the purpose of executing [the] scheme and artifice to defraud…." (*Id.* at 12, ¶ 50). It is the Government's five-count charging decision that ultimately undermines Defendant's convictions.

As an initial matter, the wire transfers that the Government specifically identified to anchor each count of wire fraud (*i.e.*, Insight's transfer of funds from its own UTB account to its own NBC account) are, in fact, nothing more than funds that constitute the entirety of the tax refunds of ITS customers, which refunds were processed by Insight for the convenience of ITS customers. (*See* Smith Test., Doc. 203 at 97) ("when people file tax returns, in a lot of cases they want to have a third party process the returns so they can take care of the payment of their preparation fees and the disbursements of their refund"). And because Insight had yet to separate and deduct ITS's fees from the customers' tax refunds, only a portion of the funds transferred on the five charged occasions belonged to ITS and its franchisees.

The decision to charge each of the five transfers as an independent count of wire fraud thereby required the Government to prove beyond a reasonable doubt that each transfer was made in furtherance of the underlying scheme to defraud. For the Government to make such an evidentiary showing, it would have needed to prove at trial either that: (a) each of the five transfers contained some ITS fees that were fraudulently obtained through the scheme to defraud; or (b) each of the five transfers were otherwise closely related to scheme, *i.e.*, "the scheme's completion or the prevention of its detection **must have depended** in some way on the **charged** [wire transmissions]." *Daniel*, 329 F.3d at 489. And, here, the Court finds that the Government failed to meet its burden.

21

a.  The Government Did Not Evidence That Any of the Five
Transfers Contained Fraudulent Funds

As previously stated, the Superseding Indictment charges the five wire transfers as follows: $1,262,197 on January 26, 2011 (Count 3); $1,906,199 on January 28, 2011 (Count 4); $17,740,900 on January 31, 2011 (Count 5); $4,000,000 on February 7, 2011 (Count 6); and $898,615 on February 11, 2011 (Count 7).  (Doc. 82 at 12).

During oral argument on Defendant's motion, the Government erroneously argued that the entire amount of the wire transfers charged in Counts 3-7 were the ITS fees that were deducted from the tax refunds.  (Doc. 191 at 61) ("these amounts in Counts 3 to 7 reflect the receipt of income which was extracted from the tax refunds on those specific dates").[13]  But as the Court has already noted, *supra*, the evidence and testimony show that the funds contained in the five charged transfers were not just the ITS fees, as the fees and the tax refunds were not separated until after the funds reached NBC.

As evidenced at trial, the scheme to defraud resulted in ITS collecting fees from customers who would not have otherwise wanted ITS to prepare their tax returns or who would not have otherwise applied for ITS lending products.  But because the monetary amounts listed in the five counts of wire fraud contain both customer tax refunds and ITS fees, the amounts identified in Counts 3-7 cannot be comprised entirely of fraudulent funds.  Rather, it is only the ITS fees contained within each transfer, if any, that might have constituted funds obtained by Defendant from the scheme to defraud.

---

[13] At oral argument, the Government offered to provide the Court with exhibits evidencing this assertion.  (Doc. 191 at 61).  However, no such exhibits were ever provided.

In that regard, it bears noting that not all of ITS's fees could possibly constitute fraudulent funds. In the years leading up to the time period charged in the wire fraud counts, ITS was one of the largest tax preparation businesses in the entire country. Thus, logically, a substantial portion of ITS fees were generated from genuine customers, who voluntarily came to ITS to have their taxes prepared, and who neither wanted nor applied for any of ITS's fraudulently advertised lending products. The Government presented no evidence indicating that every single ITS customer was duped into walking through the doors, nor that every single ITS customer was charged fraudulent "bank fees" for loans that ITS could not offer. Indeed, during oral argument, the Government acknowledged that there were certainly ITS customers who never saw any of the false advertisements. (Doc. 191 at 61-62). And therefore, there is a possibility that none of the fees contained in the transfers charged in Counts 3-7 were fraudulently obtained.

For instance, the wire fraud counts allege that the five transfers occurred on January 26, January 28, January 31, February 7, and February 11, 2011. (Doc. 82 at 12). However, the tax filing season ranges from mid-January to mid-April. Accordingly, it is plausible that no fraudulent bank fees were collected during the brief window of time between the start of the tax season (mid-January 2011) and February 11, 2011—in which case, no fraudulent fees could be contained in any of the five charged wire transfers. It is also plausible that some bank fees were collected prior to February 11, 2011 and contained in one or more the five wire transfers, but not in all five—in which case the Government failed to tie those funds to the corresponding wire transfers.

Based on the way the Government chose to charge the wire fraud counts, and in order to obtain convictions on each of the five counts, the Government needed to prove at trial, beyond a reasonable doubt, the distinction between properly earned fees and fraudulent gains, and then to evidence that even a single dollar of those fraudulent gains was contained in each of the five count. Absent such a showing, there is no evidence to indicate that any of the money contained in these five transfers was derived from the scheme to defraud, which in turn would mean that the transfers could not have served any purpose in furthering the scheme.

At oral argument, the Government asserted that differentiating between ITS customers who were lured by the fraudulent marketing scheme and those customers who were not would have been "an impossible task." (Doc. 191 at 62). The Court disagrees.

The Superseding Indictment alleges that, "under the direction of [Defendants Ogbazion and Wade], ITS franchises charged their customers 'bank fees' ranging from $20 to $50 for ICL and RAL lending products," and that, in 2011, ITS "collected approximately $1,300,000 in 'bank fees' from approximately 139,224 ITS customers …." (*Id*. at ¶ 38, 41).[14] Given the specificity with which the Government charged the amount of the bank fees, as well as the specificity with which the Government identified the

---

[14] The Court would note that the alleged fee range of $20 to $50 is in stark contrast to the range given by the Government's witness, Tara Sparks, who testified that ITS charged bank fees ranging from $150 to $300. (Doc. 202 at 266). And these ranges diverge considerably from the Government's allegation that, in 2011, "ITS franchises collected approximately $1,300,000 in 'bank fees' from approximately 139,224 ITS customers …," which, if true, would come to $9.34 per customer. (*Id*. at ¶ 41). To be clear, the Court is not implying that the amount of the fees bears any significance on whether the fees were fraudulently obtained. The Court is merely noting that the Government's own allegations are conflicting, and the testimony the Government presented at trial not only failed to substantiate these allegations, but strayed farther from them.

number of alleged victims of the scheme (all of which the Government presumably evidenced for the grand jury), the Court is unpersuaded by the Government's assertion that tying victims to the five counts of wire fraud at trial was "an impossible task."

The Government could have made its case for each of the five wire fraud charges by simply presenting the testimony of five former ITS customers who were victims of ITS's fraudulent marketing scheme and whose tax refund (along with the fraudulent fees ITS charged) were contained in each of the wire transfers charged in Counts 3-7. But the Government presented no such evidence. Indeed, during oral argument, the Government acknowledged that it presented no such evidence and, instead, asserted it should be **inferred** that, because ITS realized profits from its fraudulent marketing scheme, some portion of those fraudulent funds must have been contained in each of the transfers. (Doc. 191 at 61-62). And, again, had the Government charged one, all-encompassing count of wire fraud, it would have been far more reasonable to make such an inference. **But given the specificity with which the Government chose to charge the wire fraud counts, the Government was required to meets its burden with equal specificity**.[15]

Based on the Government's presentation of the evidence, and absent any evidence to indicate which of the five charged transfers, if any, contained even a single dollar of

---

[15] This Court frequently sees cases in which a conspiracy is charged, along with a separate count charging just the substantive, underlying offense, wherein the substantive charge effectively mirrors the underlying offense of the conspiracy. The Government's decision here to alter the underlying offense of the conspiracy so as to expand it into five separate charges is, frankly, uncommon. And, to this Court, it raises the possibility that the Government deliberately chose to charge the wire fraud counts in this manner, specifically because the five transfers carried such obscenely high monetary amounts that they would surely catch the attention (and ire) of a jury.

fraudulent funds, the jury was effectively left in the position of either convicting Defendant on all five counts or acquitting on all five counts, because there was simply no evidence to differentiate between Counts 3 through 7. The jury elected to convict on all five counts. However, given the absence of any properly specific evidence, the Court cannot allow the convictions to stand.

b. The Government Failed to Evidence That Any of the Five Transfers Were Closely Related to the Scheme

Even absent any evidence that each of the transfers contained fraudulent funds, the Government still could have made its case by showing that each of the five transfers were, in some other fashion, closely related to the fraudulent scheme. In order to show that a wire transmission is 'closely related to the scheme' to defraud, "the scheme's completion or the prevention of its detection **must have depended** in some way on the **charged** [wire transmissions]." *Daniel*, 329 F.3d at 489 (quoting *Castile*, 795 F.2d at 1278) (emphasis added). Indeed, the plain language of the wire fraud statute states that the wire communications must be transmitted "for the purpose of executing [the] scheme or artifice." [16] 18 U.S.C. § 1343 (emphasis added).

---

[16] A charge of wire fraud may also involve wires transmitted after the scheme has concluded. *See, e.g.*, *United States v. Lane*, 474 U.S. 438, 451–52 (1986). Here, neither party suggests that the scheme to defraud concluded prior to the charged wire transfers. However, assuming that the scheme was complete once customers' tax returns were filed, or once ITS advised Insight of its fees, the Government would have been required to show that the five wire transfers were in furtherance of the scheme by evidencing that Defendant caused the transfers in order "'to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of [Defendant] less likely than if no [wire transmissions] had taken place.'" *Griffith*, 17 F.3d at 874 (quoting *Lane*, 474 U.S. at 451–52). No such evidence was presented in this case.

To be clear, "the use of the [wire transmission] need not be an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (citing *Pereira v. United States*, 347 U.S. 1, 8 (1954)). However, "only if the [wire transmissions] were 'a part of the execution of the fraud,' or … were 'incident to an essential part of the scheme,' do they fall within the ban of the federal [wire] fraud statute." *Parr v. United States*, 363 U.S. 370, 390 (1960) (internal citation omitted).

Here, there were a number of wire transmissions that could have qualified as being "cause[d] … for the purpose of executing [the] scheme or artifice." 18 U.S.C. § 1343. For instance, the radio and television advertisements, ITS's submission of customers' applications for lending products that ITS could not provide, ITS's transmission of tax returns to the IRS on behalf of fraudulently induced customers, or even the transfer of properly evidenced fraudulent fees <u>from NBC to the ITS Fifth Third account</u>, all can reasonably constitute transmissions that were 'closely related to the scheme' to defraud. But the Government selected none of these transmissions to support the substantive wire fraud counts.

Instead, the Government selected five wire transfers that were <u>merely part of Insight's own internal procedure for processing tax refunds</u> on behalf of clients such as ITS.[17] And although the Court acknowledges that the transfers were a step in the overall

---

[17] An argument can also be made that this transfer of funds, by Insight, from its pre-funding account to its refund account, was not sufficiently foreseeable to meet the element of Defendant 'causing' the transfer. *See Griffith*, 17 F.3d at 874 (holding that a defendant has used or caused the use of a wire transmission if "it is foreseeable that the … wire services could be used to further his scheme").

processing of tax refunds, the specificity with which the Government chose to charge the offenses ultimately required the Government to carry its burden with the same specificity. And, in determining whether that burden has been met, "[t]he relevant question at all times is whether the [wire transmission] is <u>part of the execution of the scheme</u> <u>as **_conceived by the perpetrator_** at the time</u> …." *Schmuck*, 489 U.S. at 715 (emphasis added).

Here, there is no evidence that these internal transfers, executed by Insight, as part of Insight's own practice, was ever conceived, contemplated, or known to Defendant. Indeed, there is no evidence indicating that Defendant would have had any opinion, one way or another, as to whether these five internal transfers should occur. In all likelihood, Defendant would have been perfectly content with the disbursement of tax refunds and fees occurring out of any of the UTB banks, or from NBC, or from yet a third bank if Insight had been so inclined. The bottom line is that these <u>specific</u> transfers may have been part of <u>Insight's</u> internal process, but the Government presented no evidence indicating that the transfers mattered to Defendant. And absent such a showing, the Government cannot prove that these <u>specifically charged</u> transfers were **caused by Defendant** 'in furtherance of' or for the 'purpose of executing' Defendant's scheme to defraud. *See Kann v. United States*, 323 U.S. 88, 94 (1944) ("It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. It cannot be said that the [transmissions] in question were for the purpose of executing the scheme, as the statute requires").

Ultimately, the Government made the decision to charge Defendant with not one, but five individual and specific counts of wire fraud, and the Government tied those five counts to five very limited and specific wire transfers. Yet the Government failed to meet its burden as to these five counts with the same level of specificity. Accordingly, the Court finds that there was insufficient evidence upon which to convict Defendant of the five substantive wire fraud counts, as charged. Therefore, Defendant's motion for judgment of acquittal is granted as to Counts 3-7.[18]

### 3. Count 14 – Bank Fraud

Count 14 of the Superseding Indictment charges Defendant with bank fraud, in violation of 18 U.S.C. § 1344. (Doc. 82 at 15).

Here, the Government alleged that, on or about January 10, 2017, Defendant Ogbazion instructed an ITS employee to re-print 26 HSBC bank checks, originally issued to ITS customers as RALs, and to forge those customers' signatures on the back of the HSBC checks. (*Id*.) The Government further alleged that, at Defendant Ogbazion's instruction, the ITS Chief Financial Officer then deposited the 26 forged checks into the ITS financial operating account and used the funds to pay ITS's outstanding obligations. (*Id*.)

Defendant moves the Court to vacate the jury's guilty verdict and enter a judgment of acquittal as to the bank fraud offense, arguing that the Government failed to evidence specific intent to defraud. (Doc. 181 at 11-12). Specifically, Defendant argues that, per a

---

[18] The Court will address the Fed. R. Crim. P. 29(d) requirement for a conditional ruling, *infra*.

contractual arrangement with HSBC, Defendant knew he would be financially responsible for the duplicate checks and, therefore, could not have had the intent to deprive HSBC of any money. (*Id*. at 12). Defendant further asserts that, due to his obligation to repay HSBC, a conviction for bank fraud would effectively criminalize "defraud[ing] himself." (*Id*.)

"The bank fraud statute … prohibits any 'scheme or artifice to defraud a financial institution' or to obtain any property of a financial institution 'by false or fraudulent pretenses, representations, or promises.'" *Neder v. United States*, 527 U.S. 1, 20-21 (1999). "[T]o have the specific intent required for bank fraud <u>the defendant need not have put the bank at risk of loss in the usual sense **or intended to do so**</u>." *United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001) (emphasis added).

Here, the Court finds no merit in Defendant's argument that, in essence, his conduct does not amount to bank fraud but rather something more akin to an involuntary loan. Whether or not Defendant intended to cause a <u>permanent</u> financial loss to HSBC is of no consequence. (*See id*.) Ultimately, Defendant obtained funds from HSBC, which funds he would not have received in the first instance had he not presented the duplicate, forged checks. Thus, while Defendant's expectation of repayment may be relevant mitigation at sentencing, it has no bearing on his guilt.

Accordingly, Defendant's motion for judgment of acquittal as to Count 14 is denied.

### 4. Count 15 – Tax Evasion; and
### Counts 16 to 23 – Failure to Collect and Pay Over Payroll Tax

Although Defendant moves for judgment of acquittal as to Count 15 (tax evasion) and Counts 16 to 23 (failure to collect and pay over payroll tax), Defendant fails to allege any evidentiary deficiency as to these counts. (Doc. 181 at 13-14).[19] Rather, the entirety of Defendant's argument focuses solely on his request for a new trial—*i.e.*, that the admission of co-Defendant Wade's statements, absent Wade's testimony, tainted the trial (*id.* at 14), and that the Court erred in listing the alleged affirmative acts in the jury instructions for Count 15 (*id.* at 13).

Because Defendant's arguments as to Count 15 and Counts 16 to 23 do not allege an evidentiary deficiency and instead focus solely on his request for a new trial, he fails to assert a basis for a judgment of acquittal, and the motion is denied.

### B. Motion for a New Trial

In addition to moving for judgment of acquittal as to each count of conviction, Defendant also moves, in the alternative, for a new trial. Specifically, Defendant argues that a new trial is appropriate for three general reasons. **First**, as to all counts of conviction, Defendant argues that the convictions were contrary to the manifest weight of the evidence. **Second**, as to all counts of conviction, Defendant asserts that, because co-Defendant Wade did not testify at trial, the admission of his statements was erroneous

---

[19] In the context of his oral Rule 29(a) motion (*i.e.*, prior to jury deliberations), Defendant argued that evidence of his intent to eventually pay the payroll taxes undermined the element of "willfulness" for Counts 16-23. The Court's written Order addressed the argument and denied judgment of acquittal. (Doc. 162 at 7). Defendant does not reassert this argument in the instant motion under Rule 29 or 33. And, in any event, the Court reiterates its prior ruling.

and tainted the trial. And **third**, Defendant argues that a new trial is warranted as to Count 15 specifically, because the Court erred in its decision to include the alleged affirmative acts in the jury instructions.

Here, having granted Defendant's motion for judgment of acquittal as to Counts 3-7, the Court must also determine whether to conditionally grant Defendant a new trial on those counts. Fed. R. Crim. P. 29(d)(1).

The Court will first address the requisite conditional ruling on a new trial as to Counts 3-7, and then the Court will address each of Defendant's arguments for a new trial in turn. For the reasons stated below, the motion for a new trial is denied as to all counts.

### 1. *Conditional Ruling on New Trial as to Counts 3-7*

"If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination." Fed. R. Crim. P. 29.

Here, the Court has granted Defendant's judgment of acquittal as to Counts 3-7 based upon its determination that the Government failed to present evidence that each of the individual wire transfers charged were fraudulent in their own right or that Defendant caused each transfer in furtherance of the scheme to defraud. However, the Court has found no independent basis or error upon which a new trial should be granted.

From this Court's perspective, any reversal of the judgment of acquittal would necessarily be premised on the Sixth Circuit's determination that the Government met its burden as to each of the five counts. If the Sixth Circuit determines that this Court's

decision must be reversed, and as this Court finds no error warranting a new trial under Rule 33, the proper remedy would be to allow the jury's convictions to stand. To allow the Government to retry Defendant, however, would effectively give the Government a second bite at the apple and thereby implicate questions of double jeopardy.[20]

Accordingly, pursuant to Rule 29(d)(1), the Court conditionally denies a new trial as to Counts 3-7.

### 2. *Manifest Weight of the Evidence*

In the Court's analysis of Defendant's motion for judgment of acquittal, *supra*, the Court has already addressed the sufficiency of the evidence. Specifically, the Court grants judgment of acquittal as to Counts 3-7. As to Counts 2, 8-13, and Count 14, the Court thoroughly sets forth its finding that the Government's evidence was more than sufficient to sustain the convictions. Moreover, nothing presented by the defense at trial undermines that finding. The same is true of Counts 15 and 16-23; and as previously stated, Defendant has presented no argument challenging the sufficiency of the evidence.

Accordingly, the Court denies Defendant's request for a new trial based on the manifest weight of the evidence.

---

[20] *See Lockhart v. Nelson*, 488 U.S. 33, 40 (1988) ("a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary 'trial errors' … [because] the former is in effect a finding 'that the government has failed to prove its case' against the defendant, the latter 'implies nothing with respect to the guilt or innocence of the defendant'") (quoting *Burks v. United States*, 437 U.S. 1, 14-16 (1978)); *see also United States v. Paulus*, No. 20-6017, 2021 WL 3620445, at *2 (6th Cir. Aug. 16, 2021) ("The Supreme Court has interpreted the [Double Jeopardy] Clause as a check against 'the vast power of the sovereign' to prohibit 'prosecutors … treat[ing] trials as dress rehearsals until they secure the convictions they seek'") (quoting *Currier v. Virginia*, 138 S. Ct. 2144, 2149 (2018)).

### 3. *Admission of Co-Defendant Kyle Wade's Statements*

Defendant further argues that the Government failed to evidence the existence of, or Defendant's participation in, any conspiracy and, therefore, co-Defendant Kyle Wade's out-of-court statements were hearsay and should not have been admitted at trial.

Pursuant to Fed. R. Evid. 801(d)(2)(E), a statement is not hearsay if "[t]he statement is offered against an opposing party and … was made by the party's coconspirator during and in furtherance of the conspiracy." Alleged co-conspirator statements may be admitted in evidence, "if [the Court] finds, by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the defendant was a member of the conspiracy; and (3) that the coconspirator's statements were made in the course of and in furtherance of the conspiracy." *United States v. Pressley*, 20 F. App'x 331, 334 (6th Cir. 2001) (citing *United States v. Mack*, 159 F.3d 208, 215 (6th Cir. 1998)); *see also United States v. Barrett*, 933 F.2d 355, 358 (6th Cir. 1991) ("a predicate for the admission of alleged hearsay statements of a co-conspirator is proof of the existence of a conspiracy as determined by a trial court based upon a preponderance of the evidence") (citing *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978)). "In making this determination, the district court 'may examine the hearsay statements sought to be admitted,'" but the statements must also be corroborated by independent evidence relating to the Court's required factual determinations. *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006) (quoting *Bourjaily v. United States*, 483 U.S. 171, 181 (1987)).

Prior to the Government's presentation of evidence of a conspiracy, "[t]he district court may admit the challenged statements subject to the condition that the government

later demonstrate that the requirements of the rule have been met." *Pressley*, 20 F. App'x at 334. The Court should rule on the admissibility of the hearsay evidence at the close of the government's case-in-chief. *Barrett*, 933 F.2d at 358.

During the trial in this case, the Court conditionally admitted the statements of co-Defendant Kyle Wade. And at the close of the Government's case-in-chief, Defendant made an oral Rule 29 motion, during which he raised the very argument presently before the Court—that the Government failed to meet its evidentiary burden as to Defendant's participation in or the existence of a conspiracy, and therefore co-Defendant Wade's statements were inadmissible. (Doc. 196 at 137-140). The following day, the Court ruled on Defendant's oral Rule 29 motion by way of a written Order, in which the Court expressly found that the Government had presented sufficient independent, corroborating evidence and testimony to meet its *Enright* burden, by a preponderance of the evidence. (Doc. 162 at 6).[21] Accordingly, the Court ruled that co-Defendant Wade's out-of-court statements were not hearsay and were admissible.

Moreover, in the context of the present Order, the Court addressed the sufficiency of the evidence as to Count 2, *supra*, finding that the Government presented sufficient evidence, independent of co-Defendant Wade's statements, to prove, not only by a

---

[21] At the time the Court issued its written Order denying Defendant's oral Rule 29 motion, the jury had not yet commenced deliberations and, therefore, both conspiracy charges—Counts 2 and 24—were still pending. However, the Court's Order, issued in writing the day after Defendant made his oral Rule 29 motion at trial, inadvertently referred to "conspiracy" in the singular. Although Defendant places significance in the Court's use of the phrase "that conspiracy," the wording of the singular versus the plural was merely a typographical error.

preponderance of the evidence, but beyond a reasonable doubt: (1) the existence of the conspiracy; (2) that Defendants Ogbazion and Wade were participants in the conspiracy; and (3) that the out-of-court statements of co-Defendant Wade were made in the course of and in furtherance of the conspiracy.[22]

Based upon the Court's findings, as stated in this Order, the Court reiterates that the Government sufficiently met its burden to evidence the existence of a conspiracy and that co-Defendant Wade's statements were the statements of a co-conspirator made during the course of and in furtherance of the conspiracy. Accordingly, pursuant to Fed. R. Evid. 801(d)(2)(E), the statements were not hearsay and were therefore properly admitted.

### 4. Inclusion of Affirmative Acts in the Jury Instructions

Defendant argues that the Court erred by including the alleged affirmative acts in the jury instructions for Count 15 (tax evasion). (Doc. 181 at 12-13). Defendant argues that while the Court did not send a copy of the Superseding Indictment to the jury room during deliberations, the Court's decision to include a word-for-word recitation of the alleged affirmative acts in the jury instructions caused the same prejudicial effect. (*Id.*)

The offense of tax evasion has three elements: (1) willfulness; (2) existence of a tax deficiency; and (3) an affirmative act constituting evasion. *United States v. Spine*, 945 F.2d 143, 149 (6th Cir. 1991).

---

[22] The Court also notes that much of co-Defendant Wade's testimony was otherwise admissible as non-hearsay on other grounds, as indicated in part in footnote 9 of the Order, *supra*.

In support of his argument for a new trial as to Count 15, Defendant cites the

Second Circuit's opinion in *Esso*, which opinion Defendant summarizes as follows:

> [S]tating that it is not proper to send the indictment to the jury
> room when the indictment does not merely state the statutory
> charges against the defendant, but additionally contains a
> running narrative of the government's version of the facts of
> the case, including detailed allegations of facts **not necessary
> for the jury to find in order to address the elements of the
> charged offenses**.

(Doc. 181 at 12-13) (citing *Esso*, 684 F.3d at 352 n.5) (emphasis added).

As Defendant's own recitation of *Esso* concedes, error may arise from allowing a

deliberating jury to see and consider superfluous information, unnecessary to its

consideration of the offense at issue.  But the affirmative acts listed in the jury

instructions were not superfluous, because an affirmative act is an element of tax evasion.

Accordingly, the jury is required to find that Defendant committed an affirmative act.

In this case, the evidence presented at trial was voluminous.  Additionally, many

of the counts arose from seemingly similar conduct.  And finally, Count 15, in particular,

gave rise to an additional statute of limitations issue, for which the jury was instructed as

follows: "For you to return a guilty verdict on the tax evasion charge, the government

must convince you beyond a reasonable doubt that at least one affirmative attempt to

evade was committed after August 25, 2009."  (Doc. 171 at 38).

The Court determined that the convergence of these complexities rendered it all

the more critical to ensure that the jury's consideration was limited to only those

affirmative acts alleged in the Superseding Indictment.  In other words, the Court's

decision to include the charged affirmative acts was specifically intended to avoid

prejudice to Defendant.  And the Court did so by reining in the universe of conduct that the jury could consider in deciding both whether the Government had sufficiently evidenced an element of the offense, as well as whether the Government had charged the offense timely.

In any event, Defendant fails to explain how the inclusion of the affirmative acts actually resulted in prejudice.  Notably, Defendant's own proposed jury instructions included a non-exhaustive list of general conduct that may constitute an affirmative act. (Doc. 132 at 12) ("An affirmative attempt to evade payment consists of conduct, the likely effect of which would be to mislead or conceal, including but not limited to keeping double sets of books; making false or altered entries; making false invoices; destruction of records; concealing sources of income; and any other conduct likely to conceal or mislead") (citing *Spies v. United States*, 317 U.S. 492, 499 (1943)). Additionally, the Sixth Circuit's Pattern Jury Instructions often call for an instruction that specifically identifies similar allegations directly from the indictment, such as where the offense requires finding an overt act or means for committing an offense.  *See, e.g.*, 6th Cir. Pattern Jury Instr. 3.04, 8.03B.

The Court finds no error in the inclusion of the affirmative acts, as specifically charged in the Superseding Indictment.  Nor does the Court find that the inclusion of the affirmative acts resulted in prejudice to Defendant.  Accordingly, a new trial as to Count 15 is unwarranted.

## IV.  CONCLUSION

Based upon the foregoing, Defendant's motion for judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), is **GRANTED** as to Counts 3, 4, 5, 6, and 7; however, the Court conditionally **DENIES** a new trial on said counts, pursuant to Fed. R. Crim. P. 29(d).  Defendant's motion for judgment of acquittal or, in the alternative, a new trial, is **DENIED** as to all other counts of conviction.

**IT IS SO ORDERED.**

Date:  8/27/2021

Timothy S. Black
United States District Judge